UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                08 CR 379 (RPP)

                              - against -

                                                                **OPINION AND ORDER**


RICHARDS MEADE,

                                          Defendant.
-------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

**I. Facts and Proceedings**

        The operative indictment in this case charges the Defendant, Richards Meade,

with two counts: first, that the Defendant conspired with others to violate the narcotics

laws of the United States, by distributing and possessing with intent to distribute one

thousand kilograms and more of marijuana; second, that the Defendant conspired to

violate the narcotics laws of the United States, by distributing and possessing with intent

to distribute five kilograms and more of cocaine and one hundred kilograms and more of

marijuana.  On December 5, 2008, the Defendant pled guilty to the latter count –

distribution and possession with intent to distribute five kilograms and more of cocaine

and one hundred kilograms and more of marijuana.

        Prior to sentencing, the Defendant contended that he was eligible for relief from

the applicable mandatory minimum sentence, pursuant to 18 U.S.C. § 3553(f) (commonly

known as the "safety valve provision").  The government disputed the Defendant's

eligibility for such relief on the grounds that he has not truthfully provided all

information and evidence concerning the offense to which he pled guilty.  At a *Fatico*

hearing held on June 4, 2009, the Court heard testimony from the Defendant to ascertain whether the Defendant had "truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5).

At the hearing, the Defendant testified that, in addition to his regular occupation as an independent auto mechanic, he was involved in trafficking marijuana and cocaine. Transcript of the June 4, 2009 hearing ("Tr.") at 5. He testified that he first became involved in trafficking and dealing narcotics in 2006 when he stopped to help a car with four occupants that was pulled over to the side of the New Jersey Turnpike. *Id*. at 5, 23. After he helped the driver, Danny, get a punctured tire repaired at a repair shop, Danny gave him one hundred dollars in cash and his telephone number, saying to call him if he ever wanted anything. *Id*. at 5-6, 26. During the conversation with Danny, Danny asked the Defendant whether he was Jamaican and smoked marijuana. *Id*. at 29. The Defendant responded by saying, "not like that." *Id*. Later, while speaking with a friend named Barry, the Defendant told Barry about this incident, and remarked that Danny and the others in the car "was Mexicans." *Id*. at 6. Barry told him that "the Mexicans" would have marijuana and asked him to arrange a deal with the Mexicans. The Defendant called Danny at the telephone number he had been given, who was, at this point, located in California. *Id*. at 7-8. After some discussion, Danny and the Defendant, assisted by Barry, agreed on a price of $700 per pound, and the Defendant obtained ten pounds of marijuana by FedEx, at an address provided by Barry, without giving Danny any up-front payment. *Id*. at 8. Once the Defendant received the marijuana, Barry weighed it and dealt it to his circle of customers, and they paid Danny "$700 a pound back for the

2

Marijuana." *Id*. at 9.  The Defendant testified, however, that prior to discussing the Mexicans with Barry, he did not know that Barry was a marijuana dealer or believe Barry to be a marijuana dealer.  *Id*. at 10.  More packages of marijuana followed, which the Defendant and Barry distributed and paid for by depositing money in a bank account for Danny.  *Id*. at 11.

At one point, Barry told the Defendant that they should steal the marijuana by telling Danny that they never received a FedEx shipment.  *Id*.  The Defendant refused, saying that he did not want to because he was afraid that Danny would kill him. *Id*.  The Defendant "cut Barry out from right there because I realize he going to put me in big trouble."  *Id*.  From this point on, the Defendant conducted the marijuana transactions on his own.  *Id*.  All told, the Defendant estimated that, including the amounts he sold with Barry, he sold about one hundred or one hundred and fifty pounds of marijuana, not the one hundred and twenty kilos or more to which he had allocuted.  *Id*. at 12-13.

In addition to his marijuana trafficking, the Defendant testified that he once delivered cocaine to Saleem Jordan, but he was unaware, at the time, of the amount of cocaine that he had delivered, except that it was more than three kilograms.  *Id*. at 13, 16. He also testified that he had agreed to negotiate a subsequent shipment of three to five kilograms of cocaine for Saleem Jordan, but that package never arrived.  *Id*. at 17.  He introduced Jordan to Danny, and Danny began to ship cocaine by FedEx to Jordan. *Id*. a 14-15.  He denied being involved in trafficking any drugs besides cocaine and marijuana. *Id*. at 33.

The Defendant also testified that in the summer of 2006, he transported roughly $70,000 in cash to California, that he assumed but did not know to be profits from drug

sales.  *Id*. at 18-20.  The money was seized by law enforcement officials, but he was not arrested.  *Id*. at 21.

On cross-examination, the Defendant clarified that while he had never dealt narcotics prior to meeting Danny on the New Jersey Turnpike, he had previously transported a bag of what he believed to be marijuana.  Tr. at 23-24.  He also confirmed that he had been arrested in 2005 after a traffic stop in which it was discovered that there were four pounds of marijuana in the borrowed car in which he was driving.  *Id*. at 24-25.  He testified that he had denied knowledge of the drugs and had pled guilty to disorderly conduct.  *Id*. at 25.

When asked on cross examination about his personal drug use, the Defendant testified, "I just smoke once in a while. . . . every month or every two months I made a joint."  *Id*. at 31.  He later admitted, however, that he had told the U.S. Probation Office that he "smoked marijuana three times a day."  *Id*. at 32.  When asked about these inconsistent responses, he explained that his marijuana usage fluctuated, and that it "depends upon how I fell, how I'm feeling that day.  I might smoke three joint, one joint, sometime none."  *Id*.

Also on cross examination, the Defendant admitted that during a telephone call which had been intercepted by the government, he had told Danny that he "had a man who cooked the cocaine."  *Id*. at 35.  He explained, however, that Saleem Jordan was right next to him and so he had been saying what Jordan told him to say, but that he knew nothing about crack and was not involved in cooking the cocaine.  *Id*. at 35-36.

On cross examination, the Defendant explained that he was "not accurate with the amount of marijuana," and that he rarely knew precisely how much marijuana he had in

4

his inventory.  *Id*. at 37.  He testified that he had "between fifty and a hundred pounds of

marijuana" in his house at one point, and explained that even though he received only

about a hundred or a hundred and fifty pounds from Danny, he had so much inventory

because "it don't sell fast."  *Id*. at 39.  He later stated that his best guess was that,

counting Barry's distribution, he and Barry together had distributed 230 pounds (not

kilos) of marijuana.  *Id*. at 56.  By the time of his arrest, he had sold all of the marijuana

at his house.  *Id*. at 44.

On cross examination, the Defendant testified that he knew his co-Defendants

Winston Smith and Saleem Jordan carried guns.  *Id*. at 58-59.  He testified that he never

carried a gun and never was violent as a part of the drug conspiracy.  *Id*. at 59.  He

testified that he did not threaten co-conspirators, but that he would occasionally talk

roughly with them.  *Id*. at 59-60.  He testified that even though he kept the marijuana in

his house, he did not have a gun to protect his stash. *Id*. at 62.  During cross examination,

he was confronted with the transcript of a telephone call in which he said, "I am just

going to leave her, you know. . . . Just shoot her one of these nights here.  I just go...  I

just go for her...  Call her somewhere… just lick off her face."  Government Exhibit ("G.

Ex.") E; Tr. at 63.  During that same conversation, the Defendant said, "Or I just make a

man bust off her blood claat face."  *Id.*  The Defendant responded that the government

had "record that wrong" and was wrong in assuming that he was threatening his friend

Keesha, when he was in fact "talking about my baby mama."  Tr. at 63.  He stated that

these threats were "just words," and commented that "[i]f I was planning to do her

something, I wouldn't even say it."  *Id*. at 63-64.  During cross examination, the

government also presented the Defendant with the transcript of a telephone call in which

the Defendant told a friend who was trying to arrange a drug delivery by the Defendant to another person to "let him know that it is a gun thing that I deal with and he has to come into my area."  G. Ex. F; Tr. at 65.  On cross examination, the Defendant explained that he said he had a gun so that this other person would not try to rob him during the deal but he denied having possession of a gun.  Tr. at 65-66.

**II. Discussion**

In this case, the Defendant has the burden of proving, by a preponderance of the evidence, that he has provided the requisite truthful information to the government. *United States v. Jimenez*, 451 F.3d 97, 102 (2d Cir. 2006).  What is required of a defendant who seeks to avail himself of the relief provided by the safety valve provision "is not that he have been consistently honest throughout his dealings with the Government, but rather, that as of the time of his sentencing, he must have rendered an exhaustive and truthful portrayal of his offense conduct and all related activity."  *United States v. Nuzzo*, 385 F.3d 109, 119 n. 25 (2d Cir. 2004).  The Second Circuit has held that "a sentencing court is not bound to accept a defendant's self-serving characterizations of his role in an offense, where, as here, there is no evidence to support the defendant's story."  *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997) (internal quotation marks and citations omitted).  In other words: where the only evidence is the defendant's testimony and where that testimony is evasive or implausible, a sentencing court need not credit the defendant's testimony.

**A. First Meeting with Danny**

The Defendant claims to have become involved in trafficking narcotics after he called and requested a large quantity of marijuana from an individual who he had met

6

while assisting him on the side of the New Jersey Turnpike.  Tr. at 5-8, 23, 26.  He also

testified that he had no reason to believe was a drug dealer other than Barry's statement

that "the Mexicans" trafficked in narcotics.  *Id.*  On the basis of this one interaction,

Danny, a drug dealer with an apparently substantial supply chain, agreed to send the

Defendant ten pounds of marijuana by FedEx, without any up-front payment or other

form of guarantee.  *Id.* at 8.  This account is implausible, and the Court cannot credit the

Defendant's testimony.  The Defendant has  not met his burden of proving, by a

preponderance of the evidence, that he has been candidate and truthful in his proffer to

the government, as regards his initial interaction with Danny.

### B. Ownership or Possession of a Gun

The Defendant claimed not to have had a gun in his possession, despite the fact

that he admitted to having a stash of roughly one hundred pounds of marijuana at his

house.  *Id.* at 58-59, 62.  On cross-examination, he was confronted with the transcripts of

telephone calls that had been intercepted by the government, in which he had threatened

to shoot the mother of his children in the face.  He tried to explain that this threat was

"just words."  G. Ex. E; Tr. at 63-64.  Similarly, when confronted with his statement on a

separate phone call that someone arranging for a delivery of marijuana from him should

know that it was "a gun thing that I deal with," the Defendant tried to argue that he was

simply trying to scare the other drug dealer so that he would not be robbed.  G. Ex. F; Tr.

at 65-66.

The Court finds that the Defendant's testimony was not credible, and that he has

not met his burden of proving that he was truthful when he told the government that he

did not possess or own a gun.  The transcripts of the telephone calls show clearly that the

Defendant threatened others by invoking a gun or by threatening to shoot them. When confronted with this stark evidence, the Defendant had no explanation other than that the government was "wicked," and that his threats, which were often quite specific, were "just words." Tr. at 63, 65. The Defendant has not met his burden of proof by a preponderance of the credible evidence.

**III. Conclusion**

Because the Defendant has not met his burden of proving that he "has truthfully provided the Government all information and evidence the defendant has concerning the offense or offenses," his motion for safety valve relief is denied, aas not meeting the preponderance of evidence standard required. *See Jimenez*, 451 F.3d at 102.

IT IS SO ORDERED.

Dated:  New York, New York
May /2, 2010

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this order were faxed to:

**Counsel for Defendant:**
Bernard Alan Seidler
B. Alan Seidler, Esq.
580 Broadway
New York , NY 10012

8

Fax: (212)-334-2211

**Counsel for Government:**
Brent Scott Wible, Michael Max Rosensaft
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York , NY 10007
Fax: (212)-637-2527